UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELLIOT ADLER, on behalf of himself, individually, and on behalf of all others similarly-situated,<br><br>               Plaintiff,<br><br>    -against-<br><br>GOOGLE LLC,<br><br>              Defendant. | **COMPLAINT**<br><br>Docket No.: 23-cv-8677<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

ELLIOT ADLER ("Plaintiff"), by and through his attorneys, JOSEPH & NORINSBERG, LLC, as and for his Complaint against GOOGLE LLC ("Google" or "Defendant"), alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters as follows:

## NATURE OF THE CASE

1.    Plaintiff brings this civil action arising under New York law, seeking damages and other redress for Defendant's violations of: (i) the New York Labor Law ("NYLL")'s requirement that employers not make unlawful deductions from employees' earned wages, as amended by the "No Wage Theft Loophole Act," NYLL § 193; and/or (ii) New York contract law for breach of Plaintiff's employment contract; (iii) one of the NYLL's anti-retaliation provisions, NYLL § 215; (iv) the NYLL's requirement that employers furnish employees with wage statements containing specific categories of accurate information on each payday, NYLL § 195(3); (v) the NYLL's requirement that employers furnish employees with a wage notice at hire containing specific categories of accurate information, NYLL § 195(1); and (vi) any other claims that can be inferred from the facts set forth herein.

1

2. Defendant is Google - - the well-known subsidiary of Alphabet, Inc., a multi-trillion-dollar American multinational technology company focusing on artificial intelligence, online advertising, search engine technology, cloud computing, computer software, quantum computing, e-commerce, and consumer electronics.

3. Plaintiff worked for Defendant as a "Field Sales Representative" within its Enterprise division, a part of Defendant's "cloud" computing services operations.

4. Defendant employed Plaintiff from May 5, 2020, until April 14, 2021, based out of Defendant's Manhattan offices. At the start of his employment, Defendant required Plaintiff to sign an Offer Letter, which Defendant treated as Plaintiff's employment agreement, along with various other company-wide agreements applicable to all Enterprise Division Field Sales Representatives around the United States.

5. As described below, Defendant failed to pay Plaintiff the wages lawfully due to him under the NYLL and New York law.  Specifically, Defendant entered into a written employment contract with Plaintiff whereby Defendant guaranteed Plaintiff a commission under the NYLL - - which Defendant categorized as a non-discretionary bonus - - of 150% of his base salary, subject to certain increases or decreases based on Plaintiff satisfying various sales quotas. During his first year of employment, Plaintiff met all criteria needed to receive his commission / bonus, but Defendant unlawfully and unilaterally decided to pro-rate his compensation based on his start date, stealing $281,989.00 in commissions from Plaintiff, in gross violation of the NYLL and New York common law.

6. After Plaintiff complained to Defendant in early 2021 about Defendant's failure to pay his full commission and bonus for the prior fiscal year, Defendant's management expressly *admitted* that they did, in fact, cheat him out of his earnings. But while telling Plaintiff that Google

"reserved the right to make it better next year," Defendant refused to do so then for Plaintiff, because it was "done at scale" for *all* other Sales Representatives. That is, Defendant refused to correct their wage violations, instead doubling down by revealing that Google uniformly enforced the same unlawful pro-rating policy for *all* other Field Sales Representatives in Google's Enterprise Division *company-wide*.

7.      Reasonably refusing to continue to work for an employer that knowingly and admittedly stole from him and countless other coworkers, Defendant constructively discharged Plaintiff, forcing Plaintiff to give up lucrative convertible restricted stock unites and other valuable non-vested compensation.

8.      Because many other similarly situated employees at Google suffered the same wage theft, Plaintiff brings this lawsuit as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23, on behalf of himself, individually, and on behalf of all other persons similarly-situated during the applicable NYLL limitations period who suffered damages as a result of the Defendant's uniform and systemic violations of the NYLL, WTPA, and New York common law.

## JURISDICTION AND VENUE

9.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the action arises between Plaintiff - - a citizen of New York - - on the one hand, and Defendant - - a Delaware limited liability company whose lone member is Alphabet Inc., a separate Delaware corporation - - on the other hand.

10.      The Court also has original jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d), because the amount in controversy against the Defendant in this matter exceeds the sum or value of $5,000,000.00, exclusive of interest and

costs, and Plaintiff and the members of the proposed class are citizens of states different from that of Defendant.

11.     There are over 100 members in the proposed class.

12.     Defendant is subject to personal jurisdiction in New York, since Defendant has an office location in New York, transacts business in New York and caused economic injuries in New York.

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred within this judicial district.

14.     On March 20, 2020, then-New York Governor Andrew M. Cuomo signed Executive Order 202.8, which tolled for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued through subsequent extensions of that Order via Executive Orders 202.14, 202.28, 202.38, 202.48, 202.55, 202.60, and 202.67, through November 3, 2020. In total, the Executive Orders provided for a toll of 228 days.

## PARTIES

15.     At all relevant times herein, Plaintiff worked for Defendant and was an "employee" entitled to protection as defined by the NYLL.

16.     At all relevant times herein, Defendant was and is a Delaware limited liability company with its corporate headquarters and principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## BACKGROUND FACTS

***Google Induces Plaintiff to Leave a Competitor while Promising Him Greater Earning Potential Under Google's Compensation Plan***

17.    Defendant is Google – the multinational subdivision of Alphabet Inc., best known for its internet search engine technology and various advertisement and marketing services.

18.    Plaintiff worked for Defendant as a Field Sales Representative within Google's Enterprise Division from May 5, 2020 through April 21, 2021, based out of Defendant's New York corporate offices.

19.    Prior to his hire, Plaintiff worked as a sales representative for one of Google's competitors, earning annual total compensation of $335,000.00 of combined commissions and salary.

20.    While Google interviewed Plaintiff, Plaintiff disclosed his total On Target Earnings ("OTE") with his then-current employer, emphasizing that he would only leave his job to join Google if doing so was financially advantageous for him.

21.    In response, Google offered Plaintiff a position with a total OTE potential of at least $357,500.00, comprised of his salary of $143,000.00 plus commission eligibility of 150% of his total base salary (i.e., $214,500.00).

22.    This represented a minimum 7% increase over Plaintiff's then-current OTE with his employer prior to Google.

23.    Moreover, Google explained that if Plaintiff *exceeded* his sales quotas, he would be eligible to earn multipliers on top of his 150% commission eligibility.

24.    With the specific understanding that leaving his job to join Google could yield increased compensation, Plaintiff accepted Google's offer on or around May 4, 2020.

25.     Upon his hire, Plaintiff's primary job duties consisted of selling Google's cloud computing services - - an outsourced datacenter provider that Google sold as a service to various businesses around the globe, including products relating to cloud-based "consumption" of data, software sales, and various other information technology related services.

### *Google's Sales Bonus Plan: the Method Used to When Calculating Commissions/Bonuses*

26.     Prior to commencing his employment, Defendant required Plaintiff and all other Field Sales Representatives in its Enterprise Division to sign, and Plaintiff and others did in fact sign, a written contract for employment that included, *inter alia*, guaranteed participation in Google's "Sales Bonus Plan."

27.     Defendant's "Sales Bonus Plan" was an agreement to pay commissions to Plaintiff if he met certain annual sales "quotas" from two separate "buckets" - - software sales, and cloud data usage/storage.

28.     Defendant's Sales Bonus Plan treated "Bucket 1" as weighted at 25% of Plaintiff's total potential annual commissions.

29.     Defendant's Sales Bonus Plan treated "Bucket 2" as weighted at 75% of Plaintiff's total potential annual commissions.

30.     The Sales Bonus Plan was applicable to all Field Sales Representatives in Defendant's the Enterprise Division.

31.     Plaintiff and all other Enterprise Field Sales Representatives were eligible to participate in the Sales Bonus Plan at the start of the fiscal year quarter following their start date.

32.     Google's fiscal calendar ran from February to January.

33.     Plaintiff commenced his employment with Google in May 2020, making his participation in the Sales Bonus Plan effective August 2020.

34.    If Plaintiff met his annual quotas from August 2020 through January 2021 - - i.e., the total value in services sold in each of these two "buckets" - - Defendant promised to pay Plaintiff 150% of his annual base salary of $143,000.00, making his total OTE compensation $357,500.00 (i.e., $214,500 in commissions / bonuses, plus $143,000.00 in annual salary).

35.    The only requirement for Plaintiff to receive his annual commissions / non-discretionary bonus was that Plaintiff needed to meet or exceed the "attainment" targets in his two sales "Buckets" within the timeframe of August 2020 through January 2021, because any sales Plaintiff made from May through July 2020 were not included within his total sales figures under the Sales Bonus Plan.

36.    If Plaintiff generated sales that failed to meet one of his "buckets" within this six-month timeframe, Defendant would pay a lower commissions / bonus for that bucket, reduced proportionally to his actual sales attained.

37.    On the other hand, if Plaintiff (or any Field Sales Representative) exceeded his/their quota in a given bucket, the Sales Bonus Plan triggered an "acceleration," which doubled the total bonus potential awarded for that bucket.

38.    For example, by way of a hypothetical illustration, if Defendant established a $1,000,000.00 quota for Bucket 1, but Plaintiff only attained $900,000.00 in sales for Bucket 1, Plaintiff would receive 90% of his base eligible commission for Bucket 1.

39.    Similarly, if Plaintiff attained any amount greater than $1,000,000.00 in sales for Bucket 1, Plaintiff would receive 200% of his base eligible commission for Bucket 1.

***Plaintiff Vastly Overachieves his Annual Sales Quota Within the Six Months of His Eligibility Under Google's Sales Bonus Plan.***

40.    For his first year, Defendant assigned Plaintiff a "Bucket 1" sales quota of $1,542,610.73.

41.    Between August 2020 and January 2021, Plaintiff generated a total of $5,878,825.21 in "Bucket 1" sales, exceeding his quota by 381.01%.

42.    Because Plaintiff exceeded his "Bucket 1" annual quota, the Sales Bonus Plan "acceleration" was triggered, doubling his commissions eligibility for all "Bucket 1" sales.

43.    Because Google assigned 25% weight to Plaintiff's "Bucket 1" sales, Plaintiff was eligible to receive a 3.48% commission for his entire "Bucket 1" sales achieved from August 2020 through January 2021, amounting to $204,362.64 in commissions.

44.    This amount was then subject to an "acceleration," or doubling, for a total earned and vested commission / bonus of $408,725.28.

45.    For his first year, Defendant assigned Plaintiff a "Bucket 2" sales quota of $3,415,270.00.

46.    Between August 2020 and January 2021, Plaintiff generated a total of $3,295,929.92 in "Bucket 2" sales, which amounted to 96.51% of his total "Bucket 2" quota.

47.    Based on this calculation, and factoring in a 75% weight given to "Bucket 2," Plaintiff was eligible to receive a 4.71% commission for his entire "Bucket 2" sales achieved for his first year, amounting to $155,253.53.

48.    As a result, under the plain terms of Google's Sales Bonus Plan, Plaintiff's combined total commissions earned and vested for his first year was $563,978.81.

### ***Google Overtly Steals 50% of Plaintiff's Earned Commissions for His First Year of Employment***

49.    Despite earning this commission, Defendant unilaterally decided to contravene its own Sales Bonus Plan, Plaintiff's employment contract, and Plaintiff's offer letter, and cut Plaintiff's commission entitlement *in half.*

50.     As justification for its blatant wage theft, Google falsely claimed that because Plaintiff did not commence his employment until May, and because Plaintiff commenced participation in the Sales Bonus Plan during the start of Google's fiscal year third quarter, Defendant was permitted to pro-rate his commissions to only Google's third and fourth fiscal quarters.

51.     That is, Defendant only paid Plaintiff a total of $281,989.41 for his first year's commissions / bonus - - exactly half of Plaintiff's earned and owed commissions/bonus - - and amounting to gross wage theft violating the NYLL, WTPA, and New York law.

52.     Nothing in the offer letter that Google provided to Plaintiff limited Plaintiff's entitlement to a full year's commissions / bonuses based on his start date.

53.     Nothing in the employment contract that Google provided to Plaintiff limited Plaintiff's entitlement to a full year's commissions / bonuses based on his start date.

54.     Nothing in Google's Sales Bonus Plan limited Plaintiff's entitlement to a full year's commissions / bonuses based on his start date.

### *Google Admits its Overt Wage Theft, Causing Plaintiff's Constructive Discharge*

55.     Upon learning that Google would shortchange Plaintiff to the tune of $281,989.41, Plaintiff immediately complained to two members of Google's management team: his supervisor, Enrique Ruiz-Mateus, Enterprise Division Sales Manager; and Mr. Ruiz-Mateus's direct supervisor, Director of Google Cloud – Enterprise Division – for New York City, Ms. Gia Winters.

56.     Mr. Ruiz-Mateus and Ms. Winters then shared Plaintiff's complaints with Google's then-Vice President of Google Cloud Services for the Eastern United States Region, Michael Clark.

57.    Plaintiff complained that nowhere in his offer letter, employment contract, or the Sales Bonus Plan, was there any mention about a potential pro-rating of his commission eligibility tied to his start date.

58.    Rather, Plaintiff pointed out that the only requirement to obtain his full OTE (plus any "acceleration" under the Sales Bonus Plan) was that he attain his full Bucket 1 and Bucket 2 quotas from August 2020 through January 2021, which he more than amply achieved.

59.    In response, Ruiz-Mateus, Winters, and Clark collectively confirmed that Google "knew" that it had penalized Plaintiff without justification, and that Google "reserved the right to make it better next year."

60.    Worse, they collectively refused to correct Google's unilateral mistake because, in their words, "it was done at scale" so they "can't fix it."

61.    That is, Ruiz-Mateus, Winters, and Clark collectively revealed that Google treated all first-year Field Sales Representatives in Google's Enterprise division the same, by uniformly pro-rating their commission eligibility based on the fiscal year quarter during which they first became eligible to participate in the Sales Bonus Plan.

62.    Through Ruiz-Mateus, Winters, and Clark, Google admitted that it knowingly stole commissions from its entire staff of Enterprise division Field Sales Representatives, but refused to correct this "mistake" due to Google's significant liability for wage theft.

63.    As a consolation, Ruiz-Mateus, Winters, and Clark collectively shared with Plaintiff that Google planned to "fix" the problem - - i.e., to stop flagrantly stealing millions of dollars from its employees - - starting in the following fiscal year beginning in February 2021.

64.     This of course meant nothing for Plaintiff - - nor for any other first-year Enterprise Division Field Sales Representatives who joined Google *prior* to February 2021 - - because Google completely refused to pay earned and vested commissions for any previous fiscal years.

65.     Despite his complaints, and despite Defendant's admission to having violated the terms of its own Sales Bonus Plan, Defendant only paid Plaintiff half of his total earned and vested commission for the 2020 Google fiscal year, unlawfully deducting $281,989.00 from Plaintiff's wages.

66.     When accepting his job with Google, Plaintiff reasonably relied on Google's representations about Plaintiff's OTE potential, causing him to abandon a job that would have yielded him more wages based on Google's unlawful interpretation and breach of its own Sales Bonus Plan.

67.     As a result, because Google admitted that it knowingly stole Plaintiff's hard-earned and vested commissions, Google left Plaintiff no choice but to resign his position by way of a constructive discharge, as no reasonable employee would continue to work a job that intentionally stole hundreds of thousands of dollars from him, while simultaneously admitting to enforcing the same unlawful breach against all others similarly situated across the company.

68.     Moreover, because Defendant terminated Plaintiff by way of a constructive discharge, Plaintiff lost an estimated $225,000.00 worth of restricted stock units, scheduled to vest on annual basis, converting them into unrestricted stock unites able to be sold at fair market price, over the next three years at the time his employment ended.

69.     That is, Plaintiff was eligible to receive a total of $300,000.00 in Google stock units under a four-year vesting schedule, during which time 25% of the units would vest and convert from restricted stock to unrestricted stock each year. At the conclusion of his first year of

employment, Plaintiff 25% of his restricted stock units were converted to unrestricted stock, valued at the time at approximately $75,000.00.

70.    Were it not for Defendant's admitted wage theft forcing Plaintiff to resign as a constructive discharge, Plaintiff the remaining 75% of his restricted stock units would have converted to unrestricted stocks that Plaintiff could keep or sell, causing him lose out on at least $225,000.00 worth of unrealized gains.

71.    When Defendant paid Plaintiff his 2020 fiscal year commissions, Defendant issued Plaintiff a wage statement that inaccurately reflected his earned commissions.

72.    Similarly, when Defendant hired Plaintiff, Defendant issued Plaintiff an inaccurate wage notice that failed to comply with NYLL § 195(1), specifically by failing to accurately include any description of Plaintiff's commissions / bonus entitlement within his wage notice.

73.    Plaintiff's receipt of this inaccurate wage statement harmed Plaintiff because he was unable to ascertain the precise wages that he was owed by looking at his actual commissions earned on his wage statement, necessitating the need to hire counsel and file the instant action to advocate for himself and others similarly situated.

74.    Similarly, Plaintiff was harmed by never receiving an accurate wage notice upon hire that accurately listed the criteria for his commission eligibility - - instead, only listing his base annual salary - - as Plaintiff relied on this inaccurate notice and never learned until Defendant stole his commissions that Defendant attempted to pro-rate his commissions based on his start date within Google's fiscal year, causing him to continue to suffer by taking a job contrary to what he reasonably relied upon would be his OTE eligibility while working for fewer wages than he was owed and entitled to receive.

75.     As a result of Defendant's unlawful conduct and underpayment of wages, Plaintiff, and all other similarly situated Google employees, have suffered and continue to suffer substantial economic and compensatory damages.

## RULE 23 CLASS ALLEGATIONS

76.     In addition, Plaintiff seeks to maintain this action as a class action pursuant to FRCP 23(b)(3), individually, on his own behalf, as well as on behalf of those who are similarly situated who, during the applicable limitations period, were subjected to violations of the NYLL and the NYCRR.

77.     Plaintiff seeks certification of the following two FRCP 23 classes (collectively, "Rule 23 Plaintiffs"):

### NYLL Class

Current and former Enterprise Division sales workers who commenced their employment with Defendant in or after February of their first year, who were eligible to participate in Defendant's Sales Bonus Plan (as that term is defined below), and who worked for Defendant within the NYLL statutory period plus any applicable statutory tolling period, within the State of New York.

### Breach of Contract Class

Current and former Enterprise Division sales representatives who commenced their employment with Defendant after January of their first year of employment, and who met their annual sales quotas during their first year of work, who worked for Defendant within the United States between 2017 and 2021.

78.     All of the requirements under FRCP(b)(3) are satisfied, as set forth below.

79.     Moreover, Plaintiff and the Rule 23 Plaintiffs have all been injured in that they have been uncompensated, under-compensated, or untimely compensated due to Defendant's common policies, practices, and patterns of conduct. For instance, Plaintiff and the Rule 23 Plaintiffs have suffered a concrete injury in fact and as a result have been actually harmed by Defendant's late

13

payments of wages, specifically Defendant's underpayment and failure to pay the entirety of Plaintiff's and the Rule 23 Plaintiffs' commissions / bonuses. Specifically, Plaintiff and the Rule 23 Plaintiffs were deprived of their ability to purchase with their timely wages, invest their timely wages, accrue interest on their timely wages, or otherwise utilize the value that their wages would have held had they been paid timely.

### Numerosity & Ascertainability

80.    During the applicable NYLL limitations period, the Defendant has, in total, employed at least 100 employees that are putative members of this class.

81.    The precise number of the Rule 23 Plaintiffs is readily ascertainable through a review of Defendant's personnel, time, and payroll records.

### Common Questions of Law and/or Fact

82.    There are questions of law and fact common to each Rule 23 Plaintiff that predominate over any questions solely affecting individual members of the FRCP 23 class, including but not limited to the following: (1) the duties that the Defendant required and require each Rule 23 Plaintiff to perform; (2) the manner of compensating each Rule 23 Plaintiff; (3) whether the Defendant compensated Rule 23 Plaintiffs less than their maximum eligible commissions / bonuses for their first year of employment if they started their jobs later than January; (4) whether the Defendant furnished and furnish Rule 23 Plaintiffs with accurate wage statements when issuing them their first-year commissions/bonuses, accurately containing the information required by N.Y. Lab. Law § 195(3); (5) whether the Defendant kept and maintained accurate records necessary to calculate the manner and method used to calculated Plaintiff's and the Rule 23 Plaintiffs' first-year commissions / bonus entitlement; (6) whether the Defendant kept and maintained records with respect to the compensation that it paid to the Rule 23 Plaintiffs for

their first year commissions / bonuses; (7) whether the Defendant has any affirmative defenses to any of the Rule 23 Plaintiffs' claims; (8) whether the Defendant's actions with respect to the Rule 23 Plaintiffs were in violation of the NYLL and WTPA; and (9) if so, what constitutes the proper measure of damages.

**Typicality of Claims and/or Defenses**

83.     As described in the "Background Facts" section above, the Defendant employed Plaintiff and Rule 23 Plaintiffs within the meaning of the NYLL.  Plaintiff's claims are typical of the claims of the Rule 23 Plaintiffs whom he seeks to represent, as the Rule 23 Plaintiffs: work and/or have worked for Defendant as sales representatives in its "Enterprise Division" in New York and/or throughout the United States; Defendant failed to pay them the entirety of their eligible first-year commissions / bonuses despite meeting or exceeding their annual sales quotas/targets; and Defendant did not provide them with accurate wage statements on their pay days when paying them their first-year commissions/bonuses. Plaintiff and the Rule 23 Plaintiffs enjoy the same statutory rights under the NYLL to be paid their fully earned commissions / bonuses even for their first year of work, and to be furnished with accurate wage statements on each payday, including the payday during which they are paid their bonuses.

84.     Plaintiff and the Rule 23 Plaintiffs have all sustained similar types of damages as a result of the Defendant's failure to comply with the NYLL and WTPA.  Plaintiff and the Rule 23 Plaintiffs all have suffered injury including lack of compensation and/or untimely compensation due to the Defendant's common policies, practices, and patterns of conduct.  Thus, Plaintiff's claims and/or Defendant's defenses to those claims are typical of the Rule 23 Plaintiffs' claims and the Defendant's defenses to those claims.

**Adequacy**

85.     Plaintiff, as described below, worked the same or similar job duties as a sales representative in Defendant's Enterprise Division as the Rule 23 Plaintiffs throughout his employment with Defendant.   Defendant did not pay Plaintiff all of his earned and owed commissions for his first year of work, and did not furnish Plaintiff with an accurate wage statement on the payday during which Defendant paid Plaintiff his first year's commissions, which is substantially similar to how Defendant paid and treated the Rule 23 Plaintiffs.

86.     Plaintiff fully anticipates providing discovery responses and testifying under oath as to all of the matters raised in this Complaint and that will be raised in Defendant's Answer. Thus, Plaintiff will properly and adequately represent the current and former employees whom Defendant has subjected to the treatment alleged herein.

87.     Additionally, Plaintiff's counsel, Joseph & Norinsberg, LLC ("J&N"), has substantial experience in the field of employment law.  J&N is a well-respected litigation firm that represents Plaintiffs primarily in a wide variety of employment matters, including individual and class action litigation concerning wage and hour, discrimination, and harassment claims among others. J&N is dedicated to its clients, working tirelessly to achieve the best outcome for them, sometimes at a significant cost to the firm in terms of time, resources, and financial risk. Plaintiff's counsel has handled hundreds of employment cases in federal districts courts, including dozens of Rule 23 class actions and FLSA collective actions.  Accordingly, Plaintiff's counsel will fairly and adequately represent the interests of the putative class and will take all steps necessary to obtain class certification and appointment as class counsel.

**Superiority**

88.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual actions would engender. This action will result in the orderly and expeditious administration of Class claims. Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent and varying determinations. Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

89.     Plaintiff has no, or very few, material facts relating to the Rule 23 Plaintiffs' claims that are atypical of those of the putative class.  Indeed, at all relevant times herein, the Defendant treated Plaintiff identically, or at the very least, substantially similarly, to the Rule 23 Plaintiffs.

90.     Any lawsuit brought by a Enterprise Division sales representative based in New York and employed by Defendant would be identical to a suit brought by any other such employee for the same violations.  Thus, separate litigation would risk inconsistent results.

91.     Accordingly, this means of protecting Rule 23 Plaintiffs' rights is superior to any other method, and this action is properly maintainable as a class action under FRCP 23(b)(3).

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANT**
*Unlawful Deductions under the NYLL*

92.     Plaintiff and Rule 23 Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

93.     NYLL § 193 prohibits employers from making any deduction from an employee's wages, outside of certain limited enumerated circumstances.

94.    As described above, Defendant is an "employer" within the meaning of the NYLL, while Plaintiff and Rule 23 Plaintiffs are employees within the meaning of the NYLL.

95.    As also described above, Defendant deducted from Plaintiff's and Rule 23 Plaintiffs' earned wages without their consent by refusing to pay them a portion of, or all of, their first-year's commissions / non-discretionary bonuses.

96.    As a result, Defendant is liable to Plaintiff and Rule 23 Plaintiffs for the amount of each unlawful deduction / underpayment.

97.    Plaintiff and Rule 23 Plaintiffs are also entitled to liquidated damages, interest, and attorneys' fees for Defendant's violation of the NYLL's unlawful deduction provision.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT
### *Breach of Contract*

98.    Plaintiff and Rule 23 Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

99.    As described above, during the first year of their employment based on Defendant's fiscal year calendar, Plaintiff and Rule 23 Plaintiffs performed work according to the terms of their sales commission agreement, i.e., Defendant's Sales Bonus Plan, qualifying for their earned and vested commissions / non-discretionary bonuses.

100.    Plaintiff and Rule 23 Plaintiffs remained employees in good standing at the time the commissions / bonuses were due at the conclusion of their first fiscal year of employment, thereby performing all of their obligations under the contract.

101.    As further described above, notwithstanding that Plaintiff and Rule 23 Plaintiffs fully performed their obligations under their contracts during their first year of employment, Defendant breached the contracts by failing to pay to Plaintiff and Rule 23 Plaintiffs 50% of their

earned and vested commissions / bonuses, which remain outstanding and owed to Plaintiff and Rule 23 Plaintiffs.

102.    Accordingly, and as an alternative to the NYLL unlawful deduction claim, as a result of Defendant's actions, Plaintiff and Rule 23 Plaintiffs are entitled to recover from Defendant the shortfall between their commissions/bonus entitlement and what they received from Defendant as their first-year paid commissions/bonuses, plus interest, under a breach of contract theory of relief.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANT
### *Retaliation in Violation of the NYLL*

103.    Plaintiff, individually, repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

104.    NYLL § 215(1)(a) prohibits employers from discharging or in any other manner discriminating against an employee because such employee has made any complaint relating to what an employee reasonably and in good faith believes to be an employer's violation of the NYLL.

105.    As described above, Defendant is an "employer" within the meaning of the NYLL, while Plaintiff is an employee within the meaning of the NYLL.

106.    As also described above, after Plaintiff engaged in activity protected under NYLL § 215, Defendant retaliated against Plaintiff as detailed herein, causing Plaintiff's constructive discharge.

107.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, economic harm, for which he is entitled to an award of monetary damages and other relief.

108.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

109.    Additionally, Plaintiff is entitled to liquidated damages, punitive damages for Defendant's malicious, willful, and wanton violations of the NYLL's anti-retaliation provisions, interest, and attorneys' fees.

110.    Pursuant to NYLL § 215(2)(b), contemporaneous with the filing of this Complaint, Plaintiff is serving written notice on the Office of the New York State Attorney General, thereby advising the aforementioned of his claim for retaliation under Section 215 of the NYLL.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT
*Failure to Furnish Proper Wage Statements in Violation of the NYLL*

111.    Plaintiff and Rule 23 Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

112.    N.Y. Lab. Law § 195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria on each occasion when the employer pays wages to the employee.

113.    Defendant is an "employer" within the meaning of the NYLL, while Plaintiff and Rule 23 Plaintiffs are "employees" within the meaning of the NYLL and the NYCRR.

114.    As described above, Defendant, on each payday where they issued Plaintiff and Rule 23 Plaintiffs their first-year commissions/bonuses, failed to furnish Plaintiffs and Rule 23 Plaintiffs with accurate wage statements containing the criteria required under the NYLL,

specifically failing to accurately list Plaintiff and Rule 23 Plaintiffs' earned and owed commissions/bonuses.

115.    Pursuant to NYLL § 198(1-d), Defendant is liable to Plaintiff and Rule 23 Plaintiffs in the amount of $250.00 for each workday that the violations occurred, up to a statutory cap of $5,000.00.

**FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT**
*Failure to Furnish Proper Wage Notice in Violation of the NYLL*

116.    Plaintiff and Rule 23 Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

117.    NYLL § 195(1) requires that employers provide employees with a wage notice at the time of hire containing accurate, specifically enumerated criteria.

118.    As described above, Defendant is an "employer" within the meaning of the NYLL, while Plaintiffs and Rule 23 Plaintiffs are "employees" within the meaning of the NYLL.

119.    As also described above, Defendant failed to furnish Plaintiff and Rule 23 Plaintiffs with a wage notice at hire that accurately contained all of the criteria required under the NYLL, specifically failing to include Plaintiff and Rule 23 Plaintiffs' entitlement to their earned and vested commissions for their first year of employment.

120.    Pursuant to NYLL § 198(1-b), Defendant is liable to Plaintiff and Rule 23 Plaintiffs in the amount of $50.00 for each workday after the violations initially occurred, up to a statutory cap of $5,000.00.

**DEMAND FOR A JURY TRIAL**

121.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff and Rule 23 Plaintiffs demand a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Rule 23 Plaintiffs demand judgment against Defendant as follows:

a.     A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned New York State laws;

b.     An order restraining Defendant from any further retaliation against Plaintiff and Rule 23 Plaintiffs for participation in any form in this litigation;

c.     Certification of the claims brought in this case under the NYLL and/or New York law as a class action pursuant to FRCP 23;

d.     Designation of Plaintiff and his counsel as class action representatives under the FRCP;

e.     All damages that Plaintiff and Rule 23 Plaintiffs have sustained as a result of the Defendant's conduct, including all unpaid commissions/bonuses, lost stock / equity, and any short fall between commissions/bonuses paid and those due under the law that Plaintiff and Rule 23 Plaintiffs would have received but for Defendant's unlawful payment practices;

f.     Liquidated damages and any other statutory penalties as recoverable under the NYLL;

g.     All compensatory damages that Plaintiff, individually, has sustained due to Defendant's retaliatory conduct, including any financial out-of-pocket losses that Plaintiff might incur or might have incurred as a result of such conduct, including back pay, front pay, and loss of any other benefits of employment, whether legal or equitable;

h.      Granting an award of damages to be determined at trial to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment in connection with his retaliation claim;

i.      Granting an award of damages to be determined at trial to compensate Plaintiff for emotional distress and/or mental anguish as provided by law in connection with his retaliation claim;

j.      Punitive damages, as provided by law, due to Defendant's retaliatory conduct;

k.      Awarding Plaintiff his reasonable attorneys' fees, as well as his costs and disbursements incurred in connection with this action, including expert witness fees and other costs;

l.      Pre-judgment and post-judgment interest, as provided by law; and

m.      Granting Plaintiff and Rule 23 Plaintiffs such other and further relief as this Court finds necessary and proper.

Dated: New York, New York
       October 3, 2023

Respectfully submitted,

JOSEPH & NORINSBERG, LLC

By: _____
Jon L. Norinsberg, Esq.
Michael R. Minkoff, Esq.
110 East 59th Street, Suite 2300
New York, New York 10022
*Attorneys for Plaintiff and the Putative Classes*